**UNITED STATES of America**

v.

**James BASS, Jr., Appellant.**

**No. 75–1560.**

United States Court of Appeals, District of Columbia Circuit.

Argued Dec. 17, 1975.

Decided April 23, 1976.

Fred Warren Bennett, Washington, D. C., for appellant.

John L. Kern, Asst. U. S. Atty., Washington, D. C., for appellee. Earl J. Silbert, U. S. Atty., John A. Terry, James F. Rutherford, Charles J. Harkins, Jr., Carolyn R. Kleiman, Asst. U. S. Attys. and Stuart M. Gerson, Asst. U. S. Atty., Washington, D. C., at the time the brief was filed, were on the brief for appellee. Steven R. Schaars and Bernard J. Panetta, II, Asst. U. S. Attys., Washington, D. C., also entered appearances for appellee.

Before BAZELON, Chief Judge, ROBINSON and MacKINNON, Circuit Judges.

Opinion for the Court filed by Chief Judge BAZELON.

BAZELON, Chief Judge:

James Bass was convicted by a jury of three counts of distribution of a controlled substance in violation of 21 U.S.C. § 841(a), and was sentenced to ten years' imprisonment on each count, all sentences to run concurrently. He appeals both the conviction and the sentence. We affirm.

I

On July 13, 1974, Carl Holmes, a drug addict for over 25 years with a long criminal record and at the time on parole until 1977, sold $300 of heroin and $100 of cocaine to undercover Drug Enforcement Administration Agent James Quander. On July 23, and July 29, 1974, Holmes sold $620 of heroin to Agent Quander. A four count indictment was filed against Holmes in October, 1974. Pursuant to an agreement with the United States Attorney's Office, Holmes pleaded guilty to one count of possession of a controlled substance with intent to distribute. Holmes promised to identify his supplier, and in return the U. S. Attorney's Office agreed to inform Holmes' sentencing judge of whatever cooperation Holmes provided. As a result of Holmes' testimony before the grand jury, the appellant was indicted on four counts of distribution of a controlled substance, each count

being a sale to Holmes of narcotics which Holmes had transferred to Agent Quander on the dates recited in Holmes' indictment.

With respect to the two counts involving sales on July 13, Agent Quander testified that he had been introduced to Holmes on that date, and that Holmes had agreed to sell him $300 of heroin. Quander drove Holmes to 10th and H Streets, N.E., and observed Holmes confer with the appellant in front of a clothing store in which appellant owned a part interest. (Two District of Columbia police officers who had seen appellant on numerous other occasions testified that they, too, had observed him talking to Holmes outside the store.) Holmes returned to the car and directed Quander to 54 Galveston Street, S.W. While en route, Holmes agreed to sell $100 of cocaine in addition to the agreed upon sale of heroin. At Galveston Street Quander gave Holmes $400; Holmes entered the building and returned twenty minutes later with cocaine and heroin which he gave to Quander.[1] Holmes testified that he had gone to apartment 101 or 102 of 56 Galveston, a building attached to 54 Galveston, had met the appellant there, and had purchased the narcotics from him. Holmes further stated that he had been given the address by the appellant when they conferred outside the store, and that he had gone to the store at appellant's direction after calling him to report on the prospective buyer. A card in Holmes' possession with the phone number of appellant's store was introduced into evidence.

With respect to the July 23rd sale, Quander testified that he had again driven Holmes to Galveston Street and given him money. Quander observed Holmes enter 54 Galveston and return over an hour later with heroin. Holmes testified that he had proceeded to the same apartment, waited for appellant to arrive and then leave and return again with some heroin, and purchased from appellant the $620 of heroin that Holmes gave to Quander.

1. The identity, weight and strength of all four Government narcotics exhibits were stipulated to by the appellant.

With respect to the July 29th sale, Agent Quander testified that Holmes had forbade him from going to the site of the purchase. Quander gave Holmes $620, and Holmes returned three hours later with heroin. Holmes testified that he had gone to the Galveston Street apartment, and that while there someone had knocked on the door. According to Holmes, appellant looked through the peep hole, thought it was a narcotics agent, and exited through the window. Holmes left through the front door and when he got to the street saw appellant conversing with a stranger about a woman named Mary. After that person left, Holmes joined the appellant; they drove around for about forty-five minutes in a tan Ford station wagon, and then returned to the apartment where the appellant sold Holmes the $620 of heroin that Holmes gave Quander. Holmes' testimony was corroborated, in part, by three Drug Enforcement Administration Agents. Special Agent Blackburn stated that he had knocked on the door of apartment 101, had seen someone look through the peep hole, and upon leaving the building had observed the appellant, whom Blackburn had seen on numerous other occasions, and had engaged him in conversation about a woman named Mary or Jane.[2] Special Agent Perry testified he had seen Holmes enter 54 Galveston, had watched the appellant, whom Perry knew from the clothing store, exit from a second floor window and converse first with Agent Blackburn and then with Holmes. And Special Agent Davis reported having seen Holmes entering the building and sometime later conversing with appellant outside of the building.

Appellant testified in his own defense. He denied ever having sold narcotics to Holmes, been in apartment 101 or 102 at 56 Galveston Street, S.W., been in any apartment in 54 or 56 Galveston Street with Holmes, exited through a window on July 29, or conversed with Holmes or Agent Blackburn on the same night. He stated that his only dealings with Holmes had involved a personal loan and an extension of credit to Holmes at appellant's store.[3] He claimed that Holmes was testifying against him because appellant had refused Holmes further loans three months earlier.[4]

Appellant was convicted on two counts involving sales on July 13, and one count involving a sale on July 29. The jury was unable to reach a verdict on the count charging a sale on July 23.

## II

Appellant first argues that the district court erred in permitting Agent Quander to testify about, and the prosecutor to discuss in his closing argument, appellant's "high life style." We find no reversible error.

On direct examination Agent Quander, the Government's first witness, testified that on July 13, 1974 he had taken Holmes to 10th and H Streets, N. E., where Holmes met Bass. On cross-examination, defense counsel asked if appellant had a store there, and Quander replied that subsequent to July 13 he had so learned. Counsel then elicited testimony that Quander also had subsequently learned that appellant was vice-president of the store. When counsel asked Agent Quander whether he also had discovered how long the appellant had been at the store, the prosecutor successfully objected on hearsay grounds.

On redirect examination, Agent Quander was asked to supply appellant's home address, and was then asked, "do you know

---

2. Agent Blackburn further testified that he had knocked on the door of apartment 101 because he had heard voices, and that immediately after knocking there was silence for roughly 20 seconds. He also stated that when he was talking to the appellant outside the building, the appellant appeared nervous. Finally, Blackburn confirmed having seen appellant talk to some other person after Blackburn left, but could not identify who that person was.

3. Appellant claimed it was because of Holmes' credit account that Holmes' name and phone number appeared in appellant's personal phone book which had been seized at the time of appellant's arrest and a page of which was introduced into evidence.

4. Holmes admitted to having borrowed $300 from appellant in October, 1973 and to having purchased clothes on credit; he denied asking for a loan in December, 1974.

what kind of neighborhood that is?", to which Quander replied, "That is a residential neighborhood, fairly exclusive neighborhood." The prosecutor then asked, "Do you know what kind of a car he drives?", to which Quander stated, "I know he has three vehicles registered to him, he has a 1973 Cadillac, 1973 Ford Torino stationwagon—". At this point, defense counsel objected and the following colloquy took place:

> DEFENSE COUNSEL: Your Honor, I am going to object unless I am permitted to go into Mr. Bass' business, his yearly income and his salary.
>
> U.S. ATTORNEY: He has got the best witness for that, Your Honor.
>
> THE COURT: Yes.
>
> DEFENSE COUNSEL: Because I think it is irrelevant, as to the distribution of narcotics, as to where he lives and what he drives.
>
> THE COURT: All right, come to the bench, gentlemen.

(Tr. 105.)

> (AT THE BENCH)
>
> U.S. ATTORNEY: I am bringing out the car, because he was driving a car on the 29th.
>
> THE COURT: Well, I think you have gone far enough, is there anything else you have?
>
> U.S. ATTORNEY: No, I don't have anything further.
>
> THE COURT: All right.

The prosecutor did not return to the subject of appellant's "high life style" throughout the duration of the Government's case-in-chief, except to ask Mr. Holmes if he knew who owned or rented the Galveston Street apartment to which Holmes had gone. When Holmes stated that it was appellant's apartment, Holmes was asked, "Was that the only apartment he had there?" to which he replied, "No, I think it was another one." (sic). In contrast, defense counsel, in cross-examining Officer Hill, asked several questions about appellant's store and established that appellant had an interest and ran the store, and that it was a "relatively large size, popular" clothing store, employing 7–10 sales persons, selling the "latest type of clothing." Counsel also asked Agent Perry about the number of employees in the store. Moreover, in the defense case, counsel questioned the appellant in detail about his income, offering an auditor's statement to show that in 1974 the business grossed over $250,-000 and eliciting testimony that appellant's income from the store was $25,000. On cross-examination, the appellant stated that he also owned a four unit apartment building at 141 Galveston Street S.W. from which he derived $6,500 but admitted that because of a fire at the store, no commissions had been paid in 1974 and therefore his income from the store in 1974 was only $14,000, his salary.

In his closing argument to the jury, the prosecutor referred to all this evidence as follows:

> These are not small amounts of heroin; that is $1,500 he spent just for two or three transactions. That enables him to maintain a couple of apartments on Galveston Street, have a nice home up on Eastern Avenue, and drive a relatively new Cadillac.
>
> DEFENSE COUNSEL: If Your Honor please, I am going to object. There is no such testimony in this case about the man driving a new Cadillac and that type of thing.
>
> THE COURT: There is testimony about a Cadillac.
>
> DEFENSE COUNSEL: Which Your Honor struck out.
>
> U.S. ATTORNEY: Agent Quander testified that he was driving two or three cars, one of them a Cadillac, one of them was a Ford.
>
> THE COURT: Well, that is my recollection, but the jury's recollection controls on that. All right.
>
> U.S. ATTORNEY: Made $14,000 from the business, $6,500 from the apartments that he apparently owns, $20,000, he maintains two apartments. A nice home, relatively new Cadillac and a Ford stationwagon.
>
> I sure would like to know how he does it on that kind of salary.

But we know how he does it, ladies and gentlemen, by supplying that stuff in this city.

(Tr. 268–269.)

In reply, defense counsel, in his closing argument, contended:

My client has an interest. I am trying to protect his interest. I am trying to give you the facts in this case, but here is a man that came to you that gave you a statement prepared by his auditors which have not been challenged one bit by the Government.

May I have it, sir?

Which has been introduced in evidence, and which you can take into your jury room. Here is a man who brings you a prepared statement, showing you the sales for 1974 in his store is George's Place, Limited, amounted to $334,159.81.

Ladies and gentlemen, this will create a reasonable doubt. Why should a man making that type of money, he and his partner, and this has not been rebutted. This is evidence which you can consider when you go to your jury room for measly $300, $100 or $600, it is unreasonable. It is unreasonable to believe.

Appellant claims Agent Quander's testimony on redirect that appellant lived in a "fairly exclusive neighborhood" and owned three cars including a Cadillac, was inadmissible as (a) beyond the scope of cross-examination; (b) irrelevant; and (c) prejudicial. Significantly, however, at trial appellant's first objection was plainly conditional: appellant objected "*unless I am permitted to go into Mr. Bass' business, his yearly income and his salary.*"[5] When counsel was told he would be allowed to go into those areas, he then rephrased his objection in terms of relevance.

The phrasing of the first objection is significant in part in deciding whether the asserted error can be considered by this court on appeal, but primarily in determining whether the admission of the testimony was erroneous. Wigmore states the general rule that "when a defendant . . . seeks to show that his possession of money deprived him of any motive for crime, the fact may of course be disproved by the prosecution."[6] Here, however, the Government introduced its "high life style" evidence before the defense theory was clear. This gives us considerable pause. Appellant plausibly claims that he would not have attempted to "show that his possession of money deprived him of any motive for crime" but for the Government's early use of testimony concerning his life style.[7] Ultimately, however, we believe this claim is belied by the conditional nature of appellant's initial objection to the testimony, and, moreover, by the substance of appellant's earlier cross-examination of Agent Quander regarding appellant's business; the extent

---

5. At the time of the objection appellant already had been permitted to "go into his business," in cross-examining Agent Quander, and appellant subsequently was allowed to "go into his yearly income and his salary" in the defense case-in-chief.

6. 2 J. Wigmore, Evidence § 392 n. 5 and cases cited (1940).

7. If the Government were attempting to use appellant's financial situation to affirmatively establish a motive for the crime, two difficulties would arise. First, the inference the Government would be seeking to draw—that appellant's legitimate sources of income were inadequate to support his "high life style"— would be highly speculative absent evidence concerning the cost and financing of the house and cars. *Cf. Davis v. United States,* 133 U.S. App.D.C. 172, 409 F.2d 453 (1969); *United States v. Mullings,* 364 F.2d 173, 175–76 (2d

Cir. 1966). Second, to the extent that it were established that to support his life style appellant was in need of money in July 1974, it would also be established that appellant had needed illicit sources of income in the past. Thus, the jury might have inferred that appellant had committed other crimes, *cf. United States v. Turner,* 158 U.S.App.D.C. 197, 485 F.2d 976 (1973); *United States v. Washington,* 150 U.S.App.D.C. 68, 463 F.2d 904 (1972), and convicted on this impermissible basis. Indeed since there was no suggestion that appellant had purchased the home and three cars after July 1974 with the $1,460 he grossed from the transactions involved in the instant case, the inference of prior crimes would have been overwhelming. Thus, but for the fact that appellant "opened the door" to the challenged testimony, we would be deeply troubled by its admissibility.

to which appellant—and not the Government—subsequently dwelled on the subject of appellant's income during the Government's case; and the thrust of the defense case, including the use of an auditor's report. We therefore hold it was not reversible error to admit the testimony as probative of appellants' financial condition.[8]

Our holding with respect to this evidence does not dispose of appellant's challenge to the portion of the Assistant U.S. Attorney's closing argument relating to it. The prosecutor did not make the challenged remarks in his final summation, in response to defense counsel's closing argument. Nor did the prosecutor simply prerebut an anticipated defense argument that because of his financial condition defendant lacked a motive for the crime. The prosecutor did not even limit himself to arguing that the evidence affirmatively established a motive for the crime. Rather, the prosecutor used the evidence to argue that appellant had been able to "maintain two apartments, [a] nice home, relatively new Cadillac and a Ford station wagon" by "supplying that stuff in this city." He in effect invited the jury to infer that through past narcotic sales appellant had been able to purchase—and through a large number of present sales appellant was able to maintain—his house, apartments and cars.

Although defense counsel objected to this portion of the summation, his stated basis was that the evidence about appellant's home and cars had been stricken and that therefore there was no evidence supporting the prosecutor's statements. In this, he

was factually mistaken. On appeal he now contends that the remarks were objectionable because the prosecutor "went far beyond any legitimate inferences that could be drawn from the evidence."

■ As a general rule, it is well-settled that, absent a finding of plain error, an appellate court cannot consider grounds for objection not asserted in the trial court.[9] Like many rules, however, this one is easily stated but applied only with great difficulty. It is seldom clear to what extent counsel can be expected, in the heat of trial, to formulate objections with precision, or to what extent trial judges can be expected, in the heat of trial, to divine the true reason for concern in an inartfully phrased objection. These problems are especially difficult in the context of final summations, where there is even less time to reflect on an objection before stating it.

In the instant case, while counsel was incorrect in claiming the "high life style" evidence had been stricken, his objection called attention to the earlier colloquy regarding that evidence. In that colloquy the prosecutor had proffered at least some of the evidence for a limited purpose, and the trial judge had expressed some concern over the evidence and told the prosecutor, "I think you have gone far enough." Thus, a difficult question arises as to whether the objection to the summation on the ground that the testimony had been stricken was sufficient to put the trial judge on notice that there was a problem with the inference the prosecutor was drawing.[10]

---

**8.** *See United States v. Graydon,* 429 F.2d 120 (4th Cir. 1970).

**9.** *See, e. g.,* 3 C. Wright, Federal Practice and Procedure—Criminal § 843 and case cited (1969); *cf., e. g., United States v. Williams,* 172 U.S.App.D.C. 290, 521 F.2d 950 (1975) (same rule regarding objections to instructions under Rule 30).

**10.** An additional consideration counsels in favor of interpreting the objection so as to encompass the point now raised on appeal. In the context of prosecutor's summations, we have relaxed the rule that only objected to statements will be considered on appeal, both because an objection may only call the jury's

attention to the prejudicial remark, *United States v. Freeman,* 514 F.2d 1314, 1319 n.34 (D.C. Cir. 1975), and because an "objection cannot always procure a realistic cure for the damage," *United States v. Young,* 150 U.S.App. D.C. 98, 463 F.2d 934, 940 (1972), *quoted in United States v. Jones,* 157 U.S.App.D.C. 158, 482 F.2d 747, 754 (1973). If we were to hold that this appellant cannot challenge the summation on the ground he now asserts because he raised a different ground in the trial court, we would be placing appellant in a worse position than he would have been had he not objected at all.

But even if the issue were properly preserved for appeal, we would still be required to decide whether the error was one "not affect[ing] substantial rights" and thus to be treated as harmless under F.R. Crim.P. 52(a). In this regard we note that the evidence was properly before the jury in any event, and that the prosecutor's reference to it came in a brief, though climatic portion of his closing. Defense counsel responded to the argument in his summation, and significantly the prosecutor did not return to the issue in his final argument. Most important, the crucial issue in this case was clear: whom to believe. Holmes—and with respect to the July 29th transaction the three DEA agents who supported him—or the appellant. The jury's inability to reach a verdict on count three, for which the corroboration of Holmes' testimony was weakest, suggests that it focused on this issue and was not swayed by emotional appeals. In light of all these factors, and the form of the objection appellant made, we conclude that while the prosecutor's summation cannot be condoned, it does not warrant reversal.[11]

### III

Two days before sentencing, the Government filed with the district court, and mailed to counsel for appellant, a document headed "Government's Allocution." The document first describes the "flourishing illegal narcotics trade in existence in the District of Columbia," and its consequences in terms of thefts, drug-related deaths, and addiction rates among young persons. It then asserts that:

> Special Agents of the Drug Enforcement Agency know James Bass, Jr. to be a well-known and persistent narcotic trafficker in the Washington area. Based upon an extensive investigation by Special Agent James Quander, it has been learned that James Bass, Jr., obtains his narcotics from Hersey Jenkins and Carl Jones, both of Los Angeles, California.

> The law enforcement authorities in California—both state and federal—state that Carl Jones is a multi-kilo dealer in Southern California and has his own direct sources for narcotics in Mexico.

> It should also be noted that at the present time Hersey Jenkins and Carl Jones are under indictment in Third Circuit with many additional defendants for violation of the Controlled Substance Act. James Bass, Jr., has also come into the investigation that is presently being directed by the Drug Enforcement Agency in relation with the Philadelphia indictments.

> James Bass earned, according to his W–2 Form seized during his arrest, $14,358.56, from his business, George's Place, Limited. Nevertheless, James Bass, Jr., on December 23, 1974, purchased a home at 3505 East-West Highway, Chevy Chase, Maryland. The purchase price ac-

---

11. For the same reasons, we do not find reversible error in the prosecutor's use of the phrase "we know how he does it." In so holding, however, we do not in any way retreat from the teaching of *Gass v. United States,* 135 U.S. App.D.C. 11, 416 F.2d 767, 774 n.42 (1969), that "because of its propensity for misleading . . . the phrase 'we know' should be avoided."

Appellant's remaining contentions concerning the validity of his conviction warrant only brief comment. We decline to find plain error in the district judge's failure to have instructed the jury that because Holmes was an accomplice his testimony should have been received with caution. *See United States v. Leonard,* 161 U.S.App.D.C. 36, 494 F.2d 955 (1974). The jury was instructed, pursuant to *United States v. Kinnard,* 150 U.S.App.D.C. 386, 465 F.2d 566 (1972), "to weigh [Holmes'] testimony with ex-

treme caution" if it found he was an addict-informer, and the doubts surrounding Holmes' credibility were fully aired in the closing arguments. Nor are we willing to set aside the convictions for want of sufficient evidence simply because Holmes was the only witness who testified that the appellant made the sales. Even assuming *arguendo* the validity of appellant's asserted corroboration requirement regarding accomplice's testimony, *but see United States v. Lee,* 506 F.2d 111, 118 & n.18 (D.C. Cir. 1974), *cert. denied,* 421 U.S. 1002, 95 S.Ct. 2401, 44 L.Ed.2d 669 (1975); *Lyda v. United States,* 321 F.2d 788, 794–95 (9th Cir. 1963), Holmes' testimony was corroborated, in substantial part, by the DEA agents and police officers. Indeed, on the one count for which the corroboration was scanty, the jury was unable to reach a verdict.

cording to the County Tax Records was in the area of $119,000. James Bass, Jr., also has two automobiles registered in his name—a 1973 Cadillac and a 1973 Ford Station Wagon. Special Agents of the Drug Enforcement Agency believe that James Bass also owns a 1968 Buick. Similar statements also were made to the probation officer who prepared the presentence report, and were included in the section of the report recounting the "Official Version of Offense." The entire presentence report was made available to the appellant's counsel by the district court.

At sentencing, counsel argued that the Government's allocution was "built on innuendo or rumors, on hearsay, on anticipation and association," and urged the court to disregard it. Neither appellant nor his counsel affirmed or denied any of the statements in the allocution, other than to explain that the $119,000 house was being paid for at a rate of $277 per month, $43 more than the mortgage on the house appellant had sold. The Government stood on its written allocution, and asked that appellant be sentenced "as a wholesaler, a man who runs an organization that doesn't deal with agents working under cover . . . but deals through people that they know who are users. . . ." The district court, without explanation, imposed ten year sentences for each count, five years under the maximum, and ordered the sentences to run concurrently, and to be subject to the immediate parole eligibility provisions of 18 U.S.C. § 4208(a)(2).

On this appeal appellant contends that the district court improperly relied on what appellant characterizes as "the unsworn hearsay information" contained in the Allocution. Appellant prays that the sentence be vacated and the case remanded for resentencing.

We start from the fundamental proposition that while federal appellate courts lack the power to review the length of a sentence imposed within statutory limits,[12] "careful scrutiny of the *judicial process* by which the particular punishment was determined . . . [is] a necessary incident of what has always been appropriate appellate review of criminal cases."[13] In monitoring the sentencing process, appellate courts have shown particular concern over sentences imposed on the basis of information which was materially false. Indeed, in *Townsend v. Burke,* 334 U.S. 736, 68 S.Ct. 1252, 92 L.Ed. 1690 (1948), the Supreme Court held that the due process clause was violated when a defendant "disadvantaged by lack of counsel . . . was sentenced on the basis of assumptions concerning his criminal record which were materially untrue."[14]

Courts have not limited their focus to cases in which there was proven reliance on demonstrably false information, however. Rather, with increasing frequency, relief has been provided when the sentencing process created a significant *possibility* that misinformation infected the decision, and prophylactic measures have been developed to guard against that possibility. For example, courts have condemned ex parte submissions by prosecutors to sentencing judges.[15] Several circuits have required

**12.** *Dorszynski v. United States,* 418 U.S. 424, 431, 94 S.Ct. 3042, 3046, 41 L.Ed.2d 855, 861 (1974). The barrier to appellate review of sentence lengths is proving less impenetrable than it once appeared. *See, e. g., United States v. Bowser,* 497 F.2d 1017 (4th Cir.), *cert. denied,* 419 U.S. 857, 95 S.Ct. 105, 42 L.Ed.2d 91 (1974); *Woolsey v. United States,* 478 F.2d 139 (8th Cir. 1973); *United States v. Daniels,* 446 F.2d 967 (6th Cir. 1971).

**13.** *Dorszynski v. United States, supra,* 418 U.S. 424, note 12, at 443, 94 S.Ct. 3042, at 3053, 41 L.Ed.2d 855, at 868, *quoting United States v.*

*Hartford,* 489 F.2d 652, 654 (5th Cir. 1974) (emphasis in original).

**14.** 334 U.S. at 740–41, 68 S.Ct. 1252, at 1255, 92 L.Ed. 1690, at 1693; *see, e. g., United States v. Malcolm,* 432 F.2d 809 (2d Cir. 1970); *United States ex rel. Jackson v. Myers,* 374 F.2d 707, 710–12 (3d Cir. 1967). *See also, e. g., United States v. Slutsky,* 514 F.2d 1222 (2d Cir. 1975) (mistake of law); *United States v. Lewis,* 392 F.2d 440 (4th Cir. 1968) (same).

**15.** *See United States v. Perri,* 513 F.2d 572 (9th Cir. 1975); *United States v. Huff,* 512 F.2d 66 (5th Cir. 1975); *United States v. Rosner,* 485

disclosure of the substance of any factual information in the presentence report on which the sentencing judge intends to rely.[16] It has been held that a defendant's request for an opportunity to rebut information on which the judge relies must be granted.[17] And the Fourth Circuit twice has vacated sentences when there was no information in the record to support statements made by the sentencing judge in pronouncing sentence.[18]

The issue raised by appellant is somewhat different; commendably the Government mailed its allocution to appellant and he could have responded to it at sentencing if he so desired. Appellant contends, however, that to guard against *misinformation,* certain types of *unreliable* information must be excluded from the sentencing process even though the information is not shown to be false. Although this issue has never been directly addressed by this court, we have several times expressed concern about the reliability of information considered by sentencing judges. For example, in *Scott v. United States,* 135 U.S.App.D.C. 377, 419 F.2d 264, 266 (1969), we stated that it was our duty to "scrutinize the sentencing process to insure that the trial judge has considered the information available with some regard for its reliability." And more recently, in a case involving sentencing under the Youth Corrections Act, 18 U.S.C. § 5005, we stated that "[t]he inconsistent, conflicting and conclusory information appearing on this record raises serious questions as to its reliability. We believe that evidence of such patent unreliability itself may warrant that the record be re-

manded for further inquiry into the accuracy of the information . . . ." *United States v. Hopkins,* 174 U.S.App.D.C. ——— at ———, 531 F.2d 576 at 582 (1976).

Appellant concedes, as he must, that the mere fact that the Government's allocution contained unsworn hearsay statements does not compel its exclusion. *Williams v. New York,* 337 U.S. 241, 69 S.Ct. 1079, 93 L.Ed. 1337 (1949), teaches that the "Federal Constitution [does not] restrict the view of the sentencing judge to the information received in open court." *Id.* at 251, 69 S.Ct. at 1085, 93 L.Ed. at 1344. But we do not read *Williams* as necessarily foreclosing appellant's claim. *Williams* involved what the Court described as a "narrow contention" that *all* information must be disregarded if it comes from "witnesses with whom the accused had not been confronted and as to whom he had no opportunity for cross-examination or rebuttal . . . ." *Id.* at 243, 69 S.Ct. at 1081, 93 L.Ed. at 1340. In rejecting that contention the Court reasoned that if sentencing were made into a second trial "most of the information now relied upon by judges to guide them in the intelligent imposition of sentences would be unavailable," including the presentence reports, prepared by trained probation workers, and given a "high value by conscientious judges." *Id.* at 249–50, 69 S.Ct. at 1084, 93 L.Ed. at 1343. Indeed, the Court expressed concern that since "the modern probation report draws on information concerning every aspect of a defendant's life," requiring open court testimony and cross-examination was "totally impractical if not

F.2d 1213, 1231 (2d Cir. 1973), *cert. denied,* 417 U.S. 950, 94 S.Ct. 3080, 41 L.Ed.2d 672 (1974); *United States v. Solomon,* 422 F.2d 1110 (7th Cir.), *cert. denied,* 399 U.S. 911, 90 S.Ct. 2201, 26 L.Ed.2d 565 (1970); *Haller v. Robbins,* 409 F.2d 857 (1st Cir. 1969).

16. *See United States v. Miller,* 495 F.2d 362 (7th Cir. 1974); *United States v. Picard,* 464 F.2d 215 (1st Cir. 1972); *United States v. Janiec,* 464 F.2d 126 (3d Cir. 1972); *Baker v. United States,* 388 F.2d 931 (4th Cir. 1968). *See also* ABA Project on Minimum Standards for Criminal Justice, Sentencing Alternatives and Procedures § 4.4 (App.Draft 1968).

17. *Shelton v. United States,* 497 F.2d 156 (5th Cir. 1974); *Collins v. Buchkoe,* 493 F.2d 343 (6th Cir. 1974); *United States v. Espinoza,* 481 F.2d 553 (5th Cir. 1973). The requirement of an opportunity to rebut is implicit in the cases requiring disclosure of the Government's allocution or the pre-sentence report, *see* notes 15–16 *supra.*

18. *United States v. Looney,* 501 F.2d 1039 (4th Cir. 1974); *United States v. Powell,* 487 F.2d 325 (4th Cir. 1973).

impossible." *Id.* at 250, 69 S.Ct. at 1084, 93 L.Ed. at 1343. Thus *Williams* holds that as a matter of federal constitutional law, sentencing judges must be permitted to consider at least some hearsay information; it does not hold, either on constitutional or nonconstitutional grounds, that federal sentencing judges must be permitted to consider *all* hearsay information.

Appellant places principal reliance upon *United States v. Weston*, 448 F.2d 626 (9th Cir. 1971), *cert. denied*, 404 U.S. 1061, 92 S.Ct. 748, 30 L.Ed.2d 749 (1972). In *Weston* the district court, after stating at the conclusion of trial that it intended to impose the minimum mandatory sentence, actually imposed the maximum. In so doing, the court expressly relied on the presentence report which quoted agents of the Federal Bureau of Narcotics and Dangerous Drugs as having stated that (a) the defendant was the "chief supplier" to the Western Washington area; (b) she traveled to Mexico or Arizona biweekly to purchase $60,000 worth of heroin which she sold at $140,000 profit; and (c) four of her distributors had been arrested and two had been convicted. Defendant and her counsel denied the allegations, but offered no contrary evidence. The district judge stated that if counsel could obtain facts to contradict the presentence report, the court would reconsider its sentence.[19] The Ninth Circuit reversed, holding that it was impermissible to place this burden of refutation on defendants—

and to accept as true the allegations of narcotics agents unless disproved. Judge Duniway's words bear repetition here[20]:

> This will not do. It is tantamount to saying that once a defendant has been convicted of offense A, narcotics agents can say to the probation officer, and the probation officer can say to the judge, "we think that she is guilty of much more serious offense B, although all we have to go on is an informer's report," and the judge can then say to the defendant, "You say it isn't so; prove that to me!" In addition to the difficulty of "proving a negative," we think it a great miscarriage of justice to expect Weston or her attorney to assume the burden and expense of proving to the court that she is not the large scale dealer that the anonymous informant says that she is.

In *Townsend v. Burke, supra,* the Supreme Court made it clear that a sentence cannot be predicated on false information. We extend it but little in holding that a sentence cannot be predicated on information of so little value as that here involved. A rational penal system must have some concern for the probable accuracy of the informational inputs in the sentencing process.

■ As in *Weston* the allegations made by the Government agents in the instant case were highly damaging, went far beyond what was proved at trial, and were most difficult to refute. But unlike *We-*

---

**19.** At the same time the district court required the Government to submit, ex parte, substantiation for its charges. The appellate court found what was submitted to be inadequate. The result would have been the same, however, had no substantiation been requested, since there still would have been no basis for crediting the allegations.

**20.** *Id.* at 634; *see United States v. Janiec, supra* note 16, at 129 (requiring disclosure of prior crimes portion of presentence report because of unfairness of compelling defendant to prove the absence of convictions). *See also United States v. Needles,* 472 F.2d 652, 658 (2d Cir. 1973) ("[S]ince sentences should not be based upon misinformation . . . in some circumstances the probation office or prosecution should be requested to provide substantiation

of challenged information submitted to the judge"); *United States ex rel. Brown v. Rundle,* 417 F.2d 282, 285 (3d Cir. 1969) (requiring in-court substantiation of presentence investigator's disputed claim that defendant stated "I should have killed the son of a bitch").

Several courts have excluded certain types of evidence of prior criminal activity at least in part because of a belief that such evidence is unreliable. *See, e. g., United States v. Tucker,* 404 U.S. 443, 447–48 & n.5, 92 S.Ct. 589, 591–592, 30 L.Ed.2d 592, 596–597 (1972) (prior convictions obtained in violation of right to counsel); *Baker v. United States, supra* note 16, at 934 (no conviction or criminal charge not referable to an official record); *United States ex rel. Jackson v. Myers, supra* note 14 (discharges before magistrates).

*ston,* this appellant did not dispute the truthfulness of the allegations at sentencing. This distinction is highly significant, because the absence of a denial itself provides an important indicia of reliability.[21] We see no reason to bar sentencing judges from considering relevant information whose accuracy is not disputed. We therefore decline to vacate the sentence imposed by the district judge.

Our holding is necessarily without prejudice to the appellant moving for reduction of sentence pursuant to Rule 35 within 120 days of the issuance of our mandate. Such a motion would present appellant with another opportunity to contest the truthfulness of the Government's allocution. If a denial were to be made, the district court might request the Government to submit some verification as was done in *Weston.* Alternatively, the court might find existing factual support or indicia of reliability for the allegations, a question we have not considered. Or the district court simply could resentence appellant, making clear that it was not considering the disputed information.[22] Until a denial is made, however, the judgment must be

*Affirmed.*

---

**21.** *See United States v. Cardi,* 519 F.2d 309, 314 (7th Cir. 1975); *cf. United States ex rel. Cleveland v. Casscles,* 479 F.2d 15 (2d Cir. 1973). *Weston* has also been distinguished in cases in which there was testimony supporting charges made at sentencing, *see, e. g., United States v. Williams,* 499 F.2d 52 (1st Cir. 1974); *United States v. Allen,* 494 F.2d 1216 (3d Cir.), *cert. denied sub nom. Liles v. United States,* 419 U.S. 852, 95 S.Ct. 94, 42 L.Ed.2d 83 (1974), and in a case in which the allegations were based on face-to-face contacts, *United States v. Needles, supra* note 20. In none of these decisions has the principle articulated in *Weston* been criticized.

**22.** *Cf., e. g., McGee v. United States,* 462 F.2d 243 (2d Cir. 1972); *United States v. Latimer,* 415 F.2d 1288 (6th Cir. 1969).