**UNITED STATES of America, Plaintiff,**

**v.**

**Carmine FATICO and Daniel Fatico, Defendants.**

**No. 76–CR–81.**

United States District Court, E. D. New York.

Dec. 1, 1977.

---

**17.** *See* T.R. at 694–703, 1506–14.

David G. Trager, U. S. Atty. for the Eastern District of New York, Brooklyn, N. Y., for plaintiff; Robert Lynn, Special Atty., U. S. Dept. of Justice Organized Crime Task Force, Paul F. Corcoran, Asst. U. S. Atty., Brooklyn, N. Y., of counsel.

Saxe, Bacon & Bolan, New York City, for defendants; Roy M. Cohn, Michael Rosen, Ronald F. Poepplein, New York City, of counsel.

## MEMORANDUM AND ORDER

WEINSTEIN, District Judge.

This case presents, in one of its many aspects, the perpetual dilemma of a free society: shall it ignore fundamental rights in protecting itself against those convicted of preying on its members? Specifically, in determining an appropriate sentence, may the court rely upon testimony of an F.B.I. agent that an undisclosed informant told him that the defendant is a member of an organized crime syndicate? Under the circumstances of this case the answer is no. It is a violation of the Due Process and Confrontation clauses of the Constitution to base a critical decision affecting liberty on

information from a person the government prevents the defendant from examining.

## I. *FACTS*

Carmine Fatico and Daniel Fatico were indicted in connection with a series of armed hijackings of trucks from Kennedy airport. In indictments 76–CR–80, 76–CR–81 and 76–CR–218 the government charged the defendants with conspiracy to receive, and with receiving, goods stolen from interstate commerce during three hijackings which occurred in February and March of 1971. After their initial trial on indictment 76–CR–218 was aborted because the jury failed to agree, the defendants entered guilty pleas to the conspiracy charge contained in indictment 76–CR–81 in satisfaction of all charges in the three pending cases. As a result of their guilty pleas, each defendant faces a maximum penalty of five years imprisonment and a $10,000 fine. 18 U.S.C. § 371.

Defendants object to suggestions in the presentence reports that they have strong ties to organized crime and that they are members of the "Gambino Family," reputedly a mafia-like group. The United States has offered to support the allegation at a sentencing hearing. It proposes to rely heavily on the testimony of an F.B.I. agent who was the former head of the Bureau's Organized Crime section in the New York office. His knowledge is based upon information furnished to him by a confidential informant who allegedly is a member of the Gambino Family and who has previously supplied reliable information. The government objects to the defendants' proposed cross-examination of the F.B.I. agent about matters that might lead to the disclosure of the confidential source. It contends that revelation of the informer's identity would jeopardize his life and compromise his position as an essential font of information.

■ On the basis of cases tried here, the court takes judicial notice of the fact that there have been major hijacking gangs preying on Kennedy Airport in the Eastern District of New York. Federal Rules of Evidence, Rule 201. These criminal rings present a grave threat to both interstate and international commerce. The court further recognizes that there is substantial evidence that organized crime is involved in these operations which require sophisticated fencing through quasi-legitimate and criminal business groups.

■ Membership in an organized crime family and other ties to professional criminal groups are material facts that would and should influence the court's sentencing decision. Criminal associations enhance dangers to society and require a sentence predicated primarily on incapacitation and general deterrence. *See* A. L. I., Model Penal Code § 7.03; A. B. A. Proj. on Standards for Criminal Justice, Sentencing Alternatives and Procedures 86 (1968). *Cf. United States v. Neary,* 552 F.2d 1184 (7th Cir. 1977); 18 U.S.C. § 3575 (special and dangerous offenders). *But cf. United States v. Rao,* 296 F.Supp. 1145, 1149 (S.D. N.Y.1969).

Congress has recognized the need for a wide-ranging inquiry about a defendant's criminal associations. As part of the Organized Crime Control Act of 1970, for example, it provided:

> No limitation shall be placed on the information concerning the background, character, and conduct of a person convicted of an offense which a court of the United States may receive and consider for the purpose of imposing an appropriate sentence.

18 U.S.C. § 3577.

Courts are reluctant to deny themselves relevant data that might assist them in exercising sentencing responsibilities more effectively. We know, from cases we have tried, that fear of reprisal shuts off sources of vital evidence. Terror is particularly acute when cruel mobs, such as those defendants are accused of consorting with, are threatened. As noted in the testimony of former Attorney General Katzenbach, between 1961 and 1965 twenty-five of the government's informers in the organized crime field were murdered. Testimony at Hearings Before the Senate Subcommittee

on Administrative Practice and Procedure of the Committee of the Judiciary on Invasions of Privacy, 89th Cong., 1st Sess., pt. 3, p. 1158 (1965). Since 1965 these incidents have persisted; they present a real and continuing problem. *See, e. g., United States v. Skeens,* 145 U.S.App.D.C. 404, 406, 449 F.2d 1066, 1068 (1971). *United States v. Long,* 533 F.2d 505, 508 (9th Cir. 1976). To require revelation of informers' names is to choke off this vital source of information to the court. The government, to protect its sources, will not reveal them.

Nevertheless, for the court, without disclosure, to rely upon such untested evidence in a situation such as the one before us would violate the Fifth Amendment right to Due Process and the Sixth Amendment right of Confrontation. Cross-examination to determine the credibility of information relied upon by the government is not possible if the source is not known. Here, neither an indirect impeachment of the information through extrinsic evidence showing lack of credibility of the informer (*cf.* Federal Rules of Evidence, rule 806), nor direct attack by calling him as a hostile witness (*cf.* Federal Rules of Evidence, Rule 607), is possible.

## II. *LAW*

### A. *Rules of Evidence Not Applicable in Sentencing*

■ The Federal Rules of Evidence, other than privileges, do not apply to sentencing proceedings. Rule 1101(d)(3) provides:

(d) *Rules inapplicable.* The *rules* (other than with respect to privileges) *do not apply* in the following situations:

. . . . .

(3) Miscellaneous proceedings. Proceedings for extradition or rendition; preliminary examinations in criminal cases; *sentencing,* or granting or revoking probation; issuance of warrants for arrest, criminal summonses, and search warrants; and proceedings with respect to release on bail or otherwise.

(Emphasis added.)

As finally enacted these Rules were the joint product of (1) the rulemaking process of the Judicial Conference, its Committees

and the Supreme Court, and (2) the legislative process of Congress and the President. Even the joint effort of all three branches of government cannot eliminate constitutional imperatives.

■ Obviously, although the Rules of Evidence may be ignored in sentencing proceedings, the Constitution may not be. The Advisory Committee's Note to Rule 1101(d) states: "[T]he rule is not intended as an expression as to when due process or other constitutional provisions may require an evidentiary hearing." 56 F.R.D. 183, 351 (1972).

■ Enactment of a Rule by the joint efforts of the Supreme Court and the Congress does, nevertheless, constitute a "prima facie judgment that the Rule in question transgresses neither the Enabling Act nor constitutional restrictions." *Hanna v. Plumer,* 380 U.S. 460, 471, 85 S.Ct. 1136, 1144, 14 L.Ed.2d 8 (1965). When constitutionality is in doubt, some deference may be paid to the pronouncements of the Congress and the Supreme Court in its rulemaking function. The absence of such statements respecting Rule 1101 by the Advisory Committee which drafted the Rule, the Supreme Court itself, or by Congress or its Committees, suggests that legal principles and the case law, and not any *Hanna v. Plumer* presumption, are the proper guide to the constitutionality of the sentencing procedures at issue.

### B. *Due Process Limitations On Sentencing*

Historically, the sentencing process has been less subject to due process scrutiny than other postconviction stages of the criminal trial process where lesser or comparable liberty interests are at stake. This approach was embodied in the teaching of *Williams v. New York,* 337 U.S. 241, 69 S.Ct. 1079, 93 L.Ed. 1337 (1949). *Williams* discussed at length the practical and historical basis for different evidentiary rules governing trial and sentencing procedures.

"The due process clause," the Court concluded, "should not be treated as a device for freezing the evidential procedure of sentencing in the mold of trial procedure." *Id.*, at 251, 69 S.Ct. at 1085. It relied chiefly on the breadth of the considerations of defendant's character and background required in sentencing as compared to the narrower factual and legal issues resolved in the usual criminal trial.

> In a trial before verdict the issue is whether a defendant is guilty of having engaged in certain criminal conduct of which he has been specifically accused. Rules of evidence have been fashioned for criminal trials which narrowly confine the trial contest to evidence that is strictly relevant to the particular offense charged. These rules rest in part on a necessity to prevent a time-consuming and confusing trial of collateral issues. They were also designed to prevent tribunals concerned solely with the issue of guilt of a particular offense from being influenced to convict for that offense by evidence that the defendant had habitually engaged in other misconduct. A sentencing judge, however, is not confined to the narrow issue of guilt. His task within fixed statutory or constitutional limits is to determine the type and extent of punishment after the issue of guilt has been determined. Highly relevant—if not essential—to his selection of an appropriate sentence is the possession of the fullest information possible concerning the defendant's life and characteristics. And modern concepts individualizing punishment have made it all the more necessary that a sentencing judge not be denied an opportunity to obtain pertinent information by a requirement of rigid adherence to restrictive rules of evidence properly applicable to the trial.

*Id.*, at 246–47, 69 S.Ct. at 1083 (footnote omitted).

Considerations relating to the accuracy and reliability of the information supplied to a sentencing judge were de-emphasized in *Williams.* Instead, it relied upon the need to provide the judge with the broadest possible spectrum of information. It therefore rejected cross-examination as critical at this stage of the criminal process.

> We must recognize that most of the information now relied upon by judges to guide them in the intelligent imposition of sentences would be unavailable if information were restricted to that given in open court by witnesses subject to cross-examination. And the modern probation report draws on information concerning every aspect of a defendant's life. The type and extent of this information make totally impractical if not impossible open court testimony with cross-examination. Such a procedure could endlessly delay criminal administration in a retrial of collateral issues.

*Id.* at 250, 69 S.Ct. at 1084–85 (footnote omitted). The Court was aware that probation reports "have been given a high value by conscientious judges who want to sentence persons on the best available information rather than on guesswork and inadequate information." *Id.* at 249, 69 S.Ct. at 1084 (footnote omitted).

There has been a clear drift away from the absolute no-due-process-at-sentence position some have read into *Williams.* One critic has observed that

> The Court ignored the issue whether such a high degree of arbitrary power at a critical stage in the criminal process is tolerable. Society ought to have as much interest in seeing that the prisoner is protected from arbitrary sentencing as in seeing that he is protected from arbitrary conviction, even if in the two processes the content of "fairness" is different. The Court took the view that the only available alternatives were virtually uncontrolled judicial discretion concerning sentencing procedure and the full panoply of specific procedural rights associated with the conduct of a trial of guilt. The Court failed to examine the particular rights claimed by Williams to ascertain which could be recognized at sentencing without too great a loss of other values.

Note, Procedural Due Process at Judicial Sentencing for Felony, 81 Harv.L.Rev. 821, 827 (1968). Procedural due process cannot be eliminated from the sentencing stage.

> Where the stakes for society and individuals are as high as they are at sentencing, where there is no adequate body of substantive criteria, where there is little review of sentencing decisions, and where the results of the present "administrative" system are generally admitted to be unsatisfactory, there is a strong case for imposing at least some of the traditional standards of procedural due process.

*Id.* at 825 (footnote omitted).

The American Bar Association has recognized the dangers in abandonment of due process protection in sentencing procedures. Standard § 5.4(b) Relating to Sentencing Alternatives and Procedures, developed by its Project on Standards for Criminal Justice, approved by the ABA House of Delegates in August, 1968, provides:

> (b) Where the need for further evidence has not been eliminated by a presentence conference, evidence offered by the parties on the sentencing issue should be presented in open court with full rights of confrontation, cross-examination and representation by counsel.

In its most recent discussion of the subject, *Gardner v. Florida*, 430 U.S. 349, 97 S.Ct. 1197, 51 L.Ed.2d 393 (1977), the Supreme Court expressed significant agreement with the A.B.A.'s viewpoint. While the court limited its holding solely to capital sentencing procedures, it acknowledged that constitutional developments in sentencing over the past thirty years required it to "scrutinize a State's capital sentencing procedures more closely than was necessary in 1949." *Id.*, 430 U.S. at 357, 97 S.Ct. at 1204.

> [I]t is now clear that the sentencing process, as well as the trial itself, must satisfy the requirements of the Due Process Clause. Even though the defendant has no substantive right to a particular sentence within the range authorized by statute, the sentencing is a critical stage of the criminal proceeding at which he is entitled to the effective assistance of counsel. . . . The defendant has a legitimate interest in the character of the procedure which leads to the imposition of sentence even if he may have no right to object to a particular result of the sentencing process.

*Id.*, 430 U.S. at 358, 97 S.Ct. at 1205 (citations omitted). Rejected was the State's argument that potential sources of information will dry up unless they are given broad assurances of confidentiality. Great emphasis was placed on the quality of the information supplied.

> But consideration must be given to the quality, as well as the quantity, of the information on which the sentencing judge may rely. Assurances of secrecy are conducive to the transmission of confidences which may bear no closer relation to fact than the average rumor or item of gossip, and may imply a pledge not to attempt independent verification of the information received. The risk that some of the information accepted in confidence may be erroneous, or may be misinterpreted, by the investigator or by the sentencing judge, is manifest.

*Id.*

On at least two other occasions the Supreme Court has expressed concern about the reliability of sentencing information. In *Townsend v. Burke*, 334 U.S. 736, 68 S.Ct. 1252, 92 L.Ed. 1690 (1948), decided a year before *Williams*, the Court overturned a sentence imposed by a Pennsylvania court on the ground that the pre-sentence procedures violated due process. The defendant in *Townsend* was not represented by counsel. When imposing sentence, the judge in reviewing the defendant's record, failed to distinguish arrests from convictions and made facetious comments on the record. The Court held that,

> while disadvantaged by lack of counsel, this prisoner was sentenced on the basis of assumptions concerning his criminal record which were materially untrue. Such a result whether caused by carelessness or design, is inconsistent with due

process of law, and such a conviction cannot stand.

*Id.* at 740–41, 68 S.Ct. at 1255.

More recently, in *United States v. Tucker*, 404 U.S. 443, 92 S.Ct. 589, 30 L.Ed.2d 592 (1972), the Court again addressed the question of reliability. In *Tucker*, a federal district judge sentencing a convicted bank robber gave explicit consideration to the defendant's prior criminal record. It was later determined that two of his convictions were constitutionally invalid, having been obtained in violation of *Gideon v. Wainwright.* In approving a remand for reconsideration of the sentence the Court wrote:

> [W]e deal here, not with a sentence imposed in the informed discretion of a trial judge, but with a sentence founded at least in part upon misinformation of constitutional magnitude. As in *Townsend v. Burke*, 334 U.S. 736, 68 S.Ct. 1252, 92 L.Ed. 1690, "this prisoner was sentenced on the basis of assumptions concerning his criminal record which were materially untrue." *Id.*, at 741, 68 S.Ct. 1255. The record in the present case makes evident that the sentencing judge gave specific consideration to the respondent's previous convictions before imposing sentence upon him. Yet is is now clear that two of those convictions were wholly unconstitutional under *Gideon v. Wainwright*, 372 U.S. 335, 83 S.Ct. 792, 9 L.Ed.2d 799.

*Id.* at 447, 92 S.Ct. at 591–92 (footnote omitted).

■ The right to confront and cross-examine adverse witnesses has been held to be one of the "minimum requirements of due process." *Morrissey v. Brewer*, 408 U.S. 471, 489, 92 S.Ct. 2593, 2604, 33 L.Ed.2d 484 (1972). It is afforded criminal defendants both at trial as well as at some, but not all, post-conviction stages of the criminal trial process.

The Supreme Court has recently applied this right to parole revocation hearings, *Morrissey v. Brewer*, 408 U.S. 471, 92 S.Ct. 2593, 33 L.Ed.2d 484 (1972) and probation revocation hearings, *Gagnon v. Scarpelli*, 411 U.S. 778, 93 S.Ct. 1756, 36 L.Ed.2d 656 (1973), but has refused to extend it to prisoners on disciplinary proceedings. *Wolff v. McDonnell*, 418 U.S. 539, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1974). Determination of whether a substantial liberty interest is at stake is required.

Whether any procedural protections are due depends on the extent to which an individual will be "condemned to suffer grievous loss." *Joint Anti-Fascist Refugee Committee v. McGrath*, 341 U.S. 123, 168, 71 S.Ct. 624, 95 L.Ed. 817 (1951) (Frankfurter, J., concurring), quoted in *Goldberg v. Kelly*, 397 U.S. 254, 263, 90 S.Ct. 1011, 25 L.Ed.2d 287 (1970). The question is not merely the "weight" of the individual's interest, but whether the nature of the interest is one within the contemplation of the "liberty or property" language of the Fourteenth Amendment. *Fuentes v. Shevin*, 407 U.S. 67, 92 S.Ct. 1983, 32 L.Ed.2d 556 (1972).

*Morrissey v. Brewer*, 408 U.S. 471, 481, 92 S.Ct. 2593, 2600, 33 L.Ed.2d 484 (1972).

In *Morrissey* and *Gagnon* the Court determined that although parole and probation revocation are not stages of a criminal prosecution, both "result in a loss of liberty." *Gagnon v. Scarpelli*, 411 U.S. 778, 782, 93 S.Ct. 1756, 1760, 36 L.Ed.2d 656 (1973). As the Court explained in *Morrissey* "the liberty of a parolee, although indeterminate, includes many of the core values of unqualified liberty and its termination inflicts a 'grievous loss' on the parolee and often on others." *Morrissey v. Brewer*, 408 U.S. 471, 482, 92 S.Ct. 2593, 2601, 33 L.Ed.2d 484 (1972). Turning to the question of what process is due, the Court in *Morrissey* enumerated the various interests the State has in parole revocation proceedings, noting:

> The parolee is not the only one who has a stake in his conditional liberty. Society has a stake in whatever may be the chance of restoring him to normal and useful life within the law. Society thus has an interest in not having parole revoked because of erroneous information or because of an erroneous evaluation of the need to revoke parole, given the breach of parole conditions. . . .

And society has a further interest in treating the parolee with basic fairness: fair treatment in parole revocations will enhance the chance of rehabilitation by avoiding reactions to arbitrariness.

*Id.* at 484, 92 S.Ct. at 2601. Given these factors, the State has no interest "in revoking parole without any procedural guarantees at all." *Id.*, 92 S.Ct. at 2602. Rather, "minimum requirements of due process" are warranted, including "the right to confront and cross-examine adverse witnesses (unless the hearing officer specifically finds good cause for not allowing confrontation)". *Id.* at 489, 92 S.Ct. at 2604.

By contrast, in *Wolff*, the Court held that loss of good time credits for a prison inmate is qualitatively different from the revocation of parole for a parolee. "Simply put, revocation proceedings determine whether the parolee will be free or in prison, a matter of obvious great moment to him." *Wolff v. McDonnell*, 418 U.S. 539, 560, 94 S.Ct. 2963, 2977, 41 L.Ed.2d 935 (1974). The loss of good time, on the other hand,

> very likely, does not then and there work any change in the conditions of his liberty. It can postpone the date of eligibility for parole and extend the maximum term to be served, but it is not certain to do so, for good time may be restored.

*Id.* at 561, 94 S.Ct. at 2977. In making the distinction, the Court attached even greater significance to the fact that parole revocation hearings more resemble "the ordinary criminal trial" than do prison disciplinary proceedings. *Id.* The Court attributed this difference largely to the omnipresent security problems that prison authorities must deal with.

> If confrontation and cross-examination of those furnishing evidence against the inmate were to be allowed as a matter of course, as in criminal trials, there would be considerable potential for havoc inside the prison walls.

*Id.* at 567, 94 S.Ct. at 2980.

The sentencing process is more like parole and probation revocation hearings than it is like prison disciplinary proceedings. Loss of present liberty is at stake. A courtroom setting makes it relatively simple to afford minimum due process. Like the parolee, the convicted defendant about to be sentenced has at stake a liberty interest; its "termination inflicts a grievous loss." *Morrissey v. Brewer*, 408 U.S. 471, 482, 92 S.Ct. 2593, 2601, 33 L.Ed.2d 484 (1972). *Morrissey* did qualify the right to confront and cross-examine adverse witnesses; the right can be denied if the hearing officer specifically finds good cause for not allowing confrontation.

With this general background, we turn now to a consideration of the narrow questions presented by this case. First, is the evidence proffered by the government sufficiently reliable to be used as a basis for imposing a harsher sentence? Second, will the Faticos be afforded an adequate opportunity to rebut the substance of the information? The answer to both questions is no. Under such circumstances the courts have held *Williams* inapplicable.

Several governing principles emerge from Circuit Court decisions. First, "*Williams* holds that as a matter of federal constitutional law, sentencing judges must be permitted to consider at least some hearsay information; it does not hold, either on constitutional or nonconstitutional grounds, that federal sentencing judges must be permitted to consider *all* hearsay information." *United States v. Bass*, 175 U.S.App.D.C. 282, 292, 535 F.2d 110, 120 (1976) (Bazelon, C. J.) (emphasis in original). Second, "[m]isinformation or misunderstanding that is materially untrue regarding a prior criminal record, or material false assumptions as to any facts relevant to sentencing, renders the entire sentencing procedure invalid as a violation of due process." *United States v. Malcolm*, 432 F.2d 809, 816 (2d Cir. 1970); *United States v. Needles*, 472 F.2d 652, 657 (2d Cir. 1973). Third, "[c]ourts have not limited their focus to cases in which there was proven reliance on demonstrable false information . . . . Rather, with increasing frequency, relief has been provided when the sentencing process created a *significant possibility* that misinformation infected the decision, and prophylactic meas-

ures have been developed to guard against that possibility." *Bass, supra,* 175 U.S.App. D.C. at 290, 535 F.2d at 118 (emphasis added). Fourth, once a defendant effectively challenges the reliability of material information by throwing some reasonable doubt on it, even if he cannot demonstrably show such information to be false, it is impermissible to place the burden of refutation on the defendant. *Id.,* 175 U.S.App.D.C. at 292, 535 F.2d at 120, *relying on United States v. Weston,* 448 F.2d 626, 634 (9th Cir. 1971), *cert. denied,* 404 U.S. 1061, 92 S.Ct. 748, 30 L.Ed.2d 749 (1972); *United States v. Perri,* 513 F.2d 572, 574 (9th Cir. 1975); *see also United States v. Needles,* 472 F.2d 652, 659 (2d Cir. 1973). Fifth, "in some circumstances the probation office or prosecution should be requested to provide substantiation of challenged information submitted to the judge." *Needles, supra* at 658. Finally, decisions about appropriate procedures to insure reliable information are largely left to the discretion of the sentencing judge. *Id.* at 658; *United States v. Rosner,* 485 F.2d 1213, 1230 (2d Cir. 1973), *cert. denied,* 417 U.S. 950, 94 S.Ct. 3080, 41 L.Ed.2d 672 (1974).

The leading case is *United States v. Weston,* 448 F.2d 626 (9th Cir. 1971), *cert. denied,* 404 U.S. 1061, 92 S.Ct. 748, 30 L.Ed.2d 749 (1972). The district court had relied on information from an informer and other unnamed Federal Bureau of Narcotics and Dangerous Drugs sources that (1) the defendant was the "chief supplier" to the western Washington area; (2) she traveled to Mexico or Arizona biweekly to purchase $60,000 worth of heroin which she sold at $140,000 profit; and (3) four of her distributors had been arrested and two had been convicted. Defendant and her counsel denied the allegations, but offered no contrary evidence. Faced with such unreliable information, the Ninth Circuit reversed. It held that it was impermissible to place the burden of refutation on defendants and to accept as true the allegations of narcotics agents based upon an informer's say-so unless disproved.

This will not do. It is tantamount to saying that once a defendant has been convicted of offense A, narcotics agents can say to the probation officer, and the probation officer can say to the judge, "We think that she is guilty of much more serious offense B, although all we have to go on is an informer's report," and the judge can then say to the defendant, "You say it isn't so; prove that to me!" In addition to the difficulty of "proving a negative," we think it a great miscarriage of justice to expect Weston or her attorney to assume the burden and expense of proving to the court that she is not the large scale dealer that the anonymous informant says that she is.

In *Townsend v. Burke, supra,* the Supreme Court made it clear that a sentence cannot be predicated on false information. We extend it but little in holding that a sentence cannot be predicated on information of so little value as that here involved. A rational penal system must have some concern for the probable accuracy of the informational inputs in the sentencing process.

*Id.* at 634. The Court vacated the sentence and instructed the District Court that, on resentencing, it could not rely upon the information in the presentence report "unless it is amplified by information such as to be persuasive of the validity of the charge there made." *Id.*

Other courts have endorsed the *Weston* approach. In *United States v. Bass,* 175 U.S.App.D.C. 282, 535 F.2d 110 (1976), the District of Columbia Circuit adopted the reasoning of *Weston,* but distinguished it on the facts. The Court pointed to the fact that, unlike the defendant in *Weston,* the appellant did not dispute the truthfulness of the government's allegations at sentencing. *Id.,* 175 U.S.App.D.C. at 292–93, 535 F.2d at 120–21. In *United States v. Needles,* the Second Circuit did not follow *Weston* only because "the damaging statements here about *Needles* were based upon alleged face-to-face contact and dealings with him, and were in large part corroborated by undisputed facts and admissions." 472 F.2d 652, 659 (2d Cir. 1972).

We emphasize what the cases make clear—rigid adherence to hearsay and other rules of evidence at a sentencing hearing is not essential. *Cf., e. g., United States v. Schipani*, 315 F.Supp. 253 (E.D.N.Y.1970), *aff'd*, 435 F.2d 26 (2d Cir. 1970), *cert. denied*, 401 U.S. 983, 91 S.Ct. 1198, 28 L.Ed.2d 334 (1971). There are many peripheral, collateral, and general matters that may be established in an informal way. While the hearsay rules of the Federal Rules of Evidence generally satisfy due process and confrontation requirements, *United States v. Medico*, 557 F.2d 309, 314 n. 4 (2d Cir. 1977), there are instances where they may not give sufficient protection and, particularly in sentencing, they may in some instances be too restrictive. What is required is a sound judicial sense for what is essential to protect a defendant against injustice in sentencing.

### C. *Confrontation Clause Limitations On Sentencing*

The Supreme Court has on numerous occasions emphasized the extraordinary value our constitutional system attaches to the right of confrontation.

Certain principles have remained relatively immutable in our jurisprudence. One of these is that where governmental action seriously injures an individual, and the reasonableness of the action depends on fact findings, the evidence used to prove the Government's case must be disclosed to the individual so that he has an opportunity to show that it is untrue. While this is important in the case of documentary evidence, it is even more important where the evidence consists of the testimony of individuals whose memory might be faulty or who, in fact, might be perjurers or persons motivated by malice, vindictiveness, intolerance, prejudice, or jealousy. We have formalized these protections in the requirements of confrontation and cross-examination. They have ancient roots. They find expression in the Sixth Amendment which provides that in all criminal cases the accused shall enjoy the right "to be confronted with the witnesses against him." This Court has been zealous to protect these rights from erosion. It has spoken out not only in criminal cases, but also in all types of cases where administrative and regulatory actions were under scrutiny. . .

*Greene v. McElroy*, 360 U.S. 474, 496–97, 79 S.Ct. 1400, 1413–14, 3 L.Ed.2d 1377 (1959) (citations and footnote omitted). In *Pointer v. Texas*, 380 U.S. 400, 85 S.Ct. 1065, 13 L.Ed.2d 923 (1965), the Court held that the right granted to an accused by the Sixth Amendment to confront the witnesses against him includes the right of cross-examination and is a fundamental right essential to a fair trial in both federal and state courts.

It cannot seriously be doubted at this late date that the right of cross-examination is included in the right of an accused in a criminal case to confront the witnesses against him. And probably no one, certainly no one experienced in the trial of lawsuits, would deny the value of cross-examination in exposing falsehood and bringing out the truth in the trial of a criminal case. See, *e. g.*, 5 Wigmore, Evidence § 1367 (3d ed. 1940). The fact that this right appears in the Sixth Amendment of our Bill of Rights reflects the belief of the Framers of those liberties and safeguards that confrontation was a fundamental right essential to a fair trial in a criminal prosecution. Moreover, the decisions of this court and other courts throughout the years have constantly emphasized the necessity for cross-examination as a protection for defendants in criminal cases. This Court in *Kirby v. United States*, 174 U.S. 47, 55, 56, 19 S.Ct. 574, 43 L.Ed. 890, referred to the right of confrontation as "[o]ne of the fundamental guarantees of life and liberty," and "a right long deemed so essential for the due protection of life and liberty that it is guarded against legislative and judicial action by provisions in the Constitution of the United States and in the constitutions of most if not of all the States composing the Union." Mr. Justice Stone, writing for the Court in *Al-*

*ford v. United States,* 282 U.S. 687, 692, 51 S.Ct. 218, 75 L.Ed. 624, declared that the right of cross-examination is "one of the safeguards essential to a fair trial." *Id.,* at 404, 85 S.Ct. at 1068.

Confrontation is jealously guarded because of the important purposes it serves. The Court outlined them in *California v. Green,* 399 U.S. 149, 158, 90 S.Ct. 1930, 1935, 26 L.Ed.2d 489 (1970).

> Confrontation: (1) insures that the witness will give his statements under oath—thus impressing him with the seriousness of the matter and guarding against the lie by the possibility of a penalty for perjury; (2) forces the witness to submit to cross-examination, the "greatest legal engine ever invented for the discovery of truth"; (3) permits the jury that is to decide the defendant's fate to observe the demeanor of the witness in making his statement, thus aiding the jury in assessing his credibility.

(Footnote omitted.)

■ The rights to confront and cross-examine are not absolute. At times, the criminal trial process demands that they yield to competing interests. Nevertheless, as the Court cautioned in *Chambers v. Mississippi,* 410 U.S. 284, 295, 93 S.Ct. 1038, 1046, 35 L.Ed.2d 297 (1973), substantial justification is required before either right is denied or significantly diminished.

> Of course, the right to confront and to cross-examine is not absolute and may, in appropriate cases, bow to accommodate other legitimate interests in the criminal trial process. But its denial or significant diminution calls into question the ultimate "integrity of the fact-finding process" and requires that the competing interest be closely examined.

*Id.* (citations omitted).

Sentencing is a critical, often the most critical, stage of the criminal trial process. *See Gardner v. Florida,* 430 U.S. 349, 97 S.Ct. 1197, 1205, 51 L.Ed.2d 393 (1977). As Judge Rives observed over twenty years ago:

> The lack of constitutional and evidentiary safeguards thrown around a convicted offender is in striking contrast to those surrounding him before he is found guilty. Yet every lawyer engaged in defending criminal cases knows that often a finding of guilt is a foregone conclusion, and that the real issue centers about the severity of the punishment.

*Smith v. United States,* 223 F.2d 750, 754 (5th Cir. 1955) (citations omitted). This is certainly true today when the vast majority of convictions in the federal system result from a guilty plea. In 1974, for instance, approximately 84% of the 36,230 federal convictions were obtained by pleas of guilty or *nolo contendere.* Ad. Of. of the U.S. Courts Ann.Rep. 470 (1974). *See generally* Note, Rule 11 and Collateral Attack on Guilty Pleas, 86 Yale L.J. 1395 (1977).

■ The government has a legitimate interest in insuring that the sentencing process is not transformed into a second trial. *See United States v. Weston,* 448 F.2d 626, 634 (9th Cir. 1971), *cert. denied,* 404 U.S. 1061, 92 S.Ct. 748, 30 L.Ed.2d 749 (1972). But this interest is far from dispositive of the rights of defendants.

■ The full import of the Confrontation Clause is less than clear. Neither the history of the Sixth Amendment nor the case law delineate the reach of the Amendment's protections for criminal defendants. *California v. Green,* 399 U.S. 149, 172, 90 S.Ct. 1930, 1942, 26 L.Ed.2d 489 (1970) (Harlan, J., concurring); *United States v. Payne,* 492 F.2d 449, 455 (4th Cir. 1974) (Widener, C. J. concurring and dissenting). Several rudimentary principles emerge. First, although "that hearsay rules and the Confrontation Clause are generally designed to protect similar values," they are not congruent. *California v. Green, supra,* 399 U.S. at 155, 90 S.Ct. at 1933. The Supreme Court has

> more than once found a violation of confrontation values even though the statements in issue were admitted under an arguably recognized hearsay exception. See *Barber v. Page,* 390 U.S. 719, 88 S.Ct. 1318, 20 L.Ed.2d 255 (1968); *Pointer v. Texas,* 380 U.S. 400, 85 S.Ct. 1065, 13

L.Ed.2d 923 (1965). The converse is equally true: merely because evidence is admitted in violation of a long-established hearsay rule does not lead to the automatic conclusion that confrontation rights have been denied.

*Id.* at 155–56, 90 S.Ct. at 1934 (footnote omitted). Second, the Clause imposes at least a good-faith effort by prosecutorial authorities to obtain the presence of a critical witness at the trial. *See Barber v. Page*, 390 U.S. 719, 724–25, 88 S.Ct. 1318, 1322, 20 L.Ed.2d 255 (1968). Third, "[F]rom the scant information available it may tentatively be concluded that the Confrontation Clause was meant to constitutionalize a barrier against flagrant abuses, trials by anonymous accusers, and absentee witnesses." *California v. Green, supra* at 179, 90 S.Ct. 1946 (1969) (Harlan, J. concurring).

Considering history as well as these principles, Justice Harlan, in *California v. Green*, reasoned that at the core of the Confrontation Clause is the requirement that the prosecution produce a witness when he is available to testify.

> There is no reason in fairness why a State should not, as long as it retains a traditional adversarial trial, produce a witness and afford the accused an opportunity to cross-examine him when he can be made available.

*Id.* at 187, 90 S.Ct. at 1950. In his concurrence in *Dutton v. Evans*, 400 U.S. 74, 93, 91 S.Ct. 210, 222, 27 L.Ed.2d 213 (1970), only one year later, however, Justice Harlan abandoned this construction of the Confrontation Clause, suggesting that a due process analysis is more appropriate. *Id.* at 96–97, 91 S.Ct. at 223. Justice Harlan listed as his primary objection to the availability approach the fact that

> [A] rule requiring production of available witnesses would significantly curtail development of the law of evidence to eliminate the necessity for production of declarants where production would be unduly inconvenient and of small utility to a defendant.

*Id.* at 95–96, 91 S.Ct. at 223. As examples, he cited the Business Records Act and the exceptions to the hearsay rule for official statements, learned treatises, and trade reports. *Id.* at 96, 91 S.Ct. at 223.

Tentatively, it is suggested that the Confrontation Clause requires at least this: the government cannot affirmatively prevent the defendant from examining under oath a declarant when the declarant's knowledge is offered by the government (1) at a critical stage of the criminal process, (2) as to crucial information that (3) directly affects a substantial liberty interest of the defendant. To deny defendant access to an informant whose declarations are introduced as evidence is to affirmatively prevent the defendant from examining him. This requirement does not unduly burden the sentencing or other critical criminal processes, but it does afford the defendant his constitutionally mandated protection of confrontation. *See generally* Natali, Jr., Green, Dutton and Chambers: Three Cases in Search of a Theory, 7 Rutgers-Camden L.J. 43 (1975); Note, Hearsay and Confrontation, 32 Washington & Lee L.Rev. 243 (1975); Younger, Confrontation and Hearsay: A Look Backward, A Peek Forward, 1 Hofstra L.Rev. 32 (1973); Note, Confrontation and the Hearsay Rule, 75 Yale L.J. 1434 (1966).

### D. *Inapplicability of Informer Privilege*

It will be recalled that Rule 1101(d)(3) provides that privileges do apply at sentencing. The only relevant privilege is that for informers.

■ The government cannot rely on the informer's privilege. *Roviaro v. United States*, 353 U.S. 53, 77 S.Ct. 623, 1 L.Ed.2d 639 (1957) suggests that an informer may not be immunized from effective attack if his information is crucial to a "substantive" rather than a "procedural" decision.

We believe that no fixed rule with respect to disclosure is justifiable. The problem is one that calls for balancing the public interest in protecting the flow of information against the individual's right to prepare his defense. Whether a proper balance renders nondisclosure erroneous must depend on the particular

circumstances of each case, taking into consideration the crime charged, the possible defenses, the possible significance of the informer's testimony, and other relevant factors.

*Id.* at 62, 77 S.Ct. at 628–29.

■ A constitutional limitation on the informer privilege to block evidence needed to prove or disprove a material proposition arises from the fundamental requirements of fairness. Where the disclosure of an informer's identity, or of the contents of his communication, is relevant and helpful to the defense of an accused, or is essential to a fair determination of a cause, the privilege must give way. In these situations the trial court may require disclosure and, if the Government withholds the information, dismiss the action.

*Id.* at 60–61, 77 S.Ct. at 628. Judicial recognition of the privilege for nondispositive purposes—as in deciding if evidence should be suppressed because it was obtained in violation of the Fourth Amendment—does not violate the Sixth Amendment right to confrontation and cross-examination. *McCray v. Illinois,* 386 U.S. 300, 313–14, 87 S.Ct. 1056, 1064, 18 L.Ed.2d 62 (1967); *Cooper v. California,* 386 U.S. 58, 62 n. 2, 87 S.Ct. 788, 791, 17 L.Ed.2d 730 (1967).

Under both *McCray* and *Roviaro* the trial court's discretion is substantial. *See, e. g., Roviaro: United States v. Gonzalez,* 555 F.2d 308 (2d Cir. 1977); *United States v. Morell,* 524 F.2d 550, 557 (2d Cir. 1975); *United States v. Soles,* 482 F.2d 105, 109 (2d Cir.), *cert. denied,* 414 U.S. 1027, 94 S.Ct. 455, 38 L.Ed.2d 319 (1973); *McCray: United States v. Freund,* 525 F.2d 873, 877 (5th Cir.), *cert. denied,* 426 U.S. 923, 96 S.Ct. 2631, 49 L.Ed.2d 377 (1976); *United States v. Anderson,* 509 F.2d 724, 729 (9th Cir.), *cert. denied,* 420 U.S. 910, 95 S.Ct. 831, 42 L.Ed.2d 840 (1975).

Rule 510 of the proposed Rules of Evidence promulgated by the Supreme Court delineated the basis for, and consequences of, the distinction suggested by *Roviaro* and *McCray.* While Congress eliminated Rule 510 along with other specific rules of privilege, it never disapproved the concept it embodied. Under Rule 501 of the Federal Rules of Evidence, Proposed Rule 510 remains a useful guide and standard. Subdivision (c)(2) of proposed Rule 510, which rests squarely on *Roviaro,* deals with informer testimony necessary to "a material issue on the merits." It reads in part:

(2) Testimony on merits.—If it appears from the evidence in the case or from other showing by a party that an informer may be able to give testimony necessary to a fair determination of the issue of guilt or innocence in a criminal case or of a material issue on the merits in a civil case to which the government is a party, and the government invokes the privilege, the judge shall give the government an opportunity to show *in camera* facts relevant to determining whether the informer can, in fact, supply that testimony. The showing will ordinarily be in the form of affidavits, but the judge may direct that testimony be taken if he finds that the matter cannot be resolved satisfactorily upon affidavit. *If the judge finds that there is a reasonable probability that the informer can give the testimony, and the government elects not to disclose his identity, the judge on motion of the defendant in a criminal case shall dismiss the charges* to which the testimony would relate, and the judge may do so on his own motion. . . .

(Emphasis supplied.) Subdivision (c)(3), on the other hand, focuses not on the merits, but on informer testimony relied upon to decide the collateral issue of the "legality of the means by which evidence was obtained." It reads:

(3) Legality of obtaining evidence.—If information from an informer is relied upon to establish the legality of the means by which evidence was obtained and the judge is not satisfied that the information was received from an informer reasonably believed to be reliable or credible, *he may require the identity of the informer to be disclosed.*

(Emphasis supplied.)

In the case before us, the informant testimony offered by the government does not concern the guilt or innocence of the de-

fendant. The defendant has pleaded guilty. Nor does the testimony concern a collateral or preliminary matter such as determining the legality of the means by which evidence was obtained. On their face, therefore, neither subdivisions (c)(2) or (c)(3) apply. There can be little question nonetheless that the determination the court must make in this case is anything but collateral. The informant·testimony offered by the government is, it concedes, central information that directly affects a substantial liberty interest of the defendant. At stake, is the difference between freedom and up to five years in prison. The sentencing decision before the court is thus properly analogized to the determinations affecting guilt or innocence dealt with in *Roviaro* and subdivision (c)(2) of proposed Rule 510. If the government is to rely on the informer, it must disclose his identity.

The issue is almost identical with that faced in a case such as *United States v. Duardi,* 384 F.Supp. 874, 881 (W.D.Mo.1974), where the Court had to decide whether the government had adduced sufficient evidence to support a judicial finding that defendants were dangerous special offenders subject to enhanced sentencing procedures. The Court in *Duardi* noted:

> [T]he government's declared intention to offer the testimony of F.B.I. and Bureau of Narcotic Agents as to what faceless confidential informants told them about alleged contacts with particular defendants and the other "organized crime" evidentiary data above summarized, does not meet due process requirements. We believe it obvious that it would be impossible to test the truth of what the government agents may testify that informants may have told them; it is equally impossible to subject an unnamed informant to cross-examination.

*Cf. United States v. Neary,* 552 F.2d 1184 (7th Cir. 1977).

■ In doubtful cases an *in camera* hearing may assist the court in determining whether information from an informer should be relied upon in sentencing. *Cf., e. g.,* proposed Rule 510(c)(2)(3) of Federal Rules of Evidence; *Socialist Workers Party v. Attorney General,* 565 F.2d 19, 23 (2d Cir. 1977); *United States v. Rawlinson,* 487 F.2d 5 (9th Cir. 1973), *cert. denied,* 415 U.S. 984, 94 S.Ct. 1579, 39 L.Ed.2d 881 (1974); *United States v. Freund,* 525 F.2d 873, 877 (5th Cir.), *cert. denied,* 426 U.S. 923, 96 S.Ct. 2631, 49 L.Ed.2d 377 (1976). In this case such a hearing would serve no purpose except to increase the hazards to the informer by "unnecessary rummaging in government files." *Cf. Socialist Workers Party v. Attorney General,* 565 F.2d 19, 23.

### III. CONCLUSION

■ In this sentencing hearing the court cannot rely upon the critical information of an undisclosed informant given by an F.B.I. agent who is not subject to meaningful cross-examination. This evidence, offered by the government, is excluded.

So ordered.